Anne P. NEWMAN, Sharon W. Neal and John Mungin, Plaintiffs,

v.

PIGGIE PARK ENTERPRISES, INC., a Corporation, and L. Maurice Bessinger, Defendants.

Civ. A. No. AC–1605.

United States District Court
D. South Carolina,
Columbia Division.

July 28, 1966.

Matthew J. Perry, Columbia, S. C., Jack Greenberg, New York City, for plaintiffs.

Samuel B. Ray, Jr., Barnwell, S. C., for defendants.

## ORDER

SIMONS, District Judge.

This suit was commenced December 18, 1964 by plaintiffs, who are Negro citizens and residents of South Carolina and of the United States, on behalf of themselves and others similarly situated, pursuant to Rule 23(a) (3) of the Federal Rules of Civil Procedure. Jurisdiction of this court is expressly conferred by Title II, Section 207 of the Civil Rights Act of 1964, 42 U.S.C. Section 2000a–6.[1]

The gravamen of plaintiffs' complaint is that corporate defendant operates several restaurants in Columbia and elsewhere in South Carolina which are places

---

1. "§ 2000a–6. *Jurisdiction; exhaustion of other remedies; exclusiveness of remedies; assertion of rights based on other Federal or State laws and pursuant of remedies for enforcement of such rights*

"(a) The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this subchapter and shall exercise the same without regard to whether the aggrieved party shall have exhausted any administrative or other remedies that may be provided by law.

"(b) The remedies provided in this subchapter shall be the exclusive means of enforcing the rights based on this subchapter, but nothing in this subchapter shall preclude any individual or any State or local agency from asserting any right based on any other Federal or State law not inconsistent with this subchapter, including any statute or ordinance requiring nondiscrimination in public establishments or accommodations, or from pursuing any remedy, civil or criminal, which may be available for the vindication or enforcement of such right. Pub.L. 88–352, Title II, § 207, July 2, 1964, 78 Stat. 245."

of public accommodation within the purview of the Civil Rights Act of 1964; and that defendant violated said Act by denying service to plaintiffs at certain of its restaurants on July 3rd and August 12th, 1964 solely upon the ground that they were Negroes. The complaint further specifically alleges that in their restaurants defendants serve and offer to serve interstate travelers; that a substantial portion of the goods which they serve move in interstate commerce; and that defendants' operations affect commerce between the states. Plaintiffs ask that defendants be temporarily and permanently enjoined from discriminating against plaintiffs and the class of persons they represent upon the ground of race, color, religion and national origin.

Defendants admit jurisdiction of the court under Section 2000a–6, supra, generally deny the material allegations of plaintiffs' complaint, and specifically deny the allegations of the complaint which allege that their establishments are places of public accommodation as defined in the Civil Rights Act of 1964. Although defendants concede that they cater to white trade only and refuse to serve members of the Negro race at their restaurants for on-the-premises consumption of food, they stoutly maintain that they do not come within the coverage of Section 2000a(b) (2) and (c) (2) of the Act, infra note 2, because (1) they do not serve the public as required by the Act; (2) they are not principally engaged in selling food for consumption on the premises; (3) they do not serve or offer to serve interstate travelers; and (4) they do not serve food, a substantial portion of which has moved in commerce.

Defendants further contend that all foodstuffs served by them which are processed in this state, including cattle and hogs slaughtered in South Carolina, although shipped in commerce from another State to this State, cannot be considered as moving in interstate commerce under the Act; that the Act denies defendants "due process of law and/or equal protection of the law" as guaranteed by the Fourteenth Amend-

ment; that the phrase "substantial portion of the food which it serves * * * has moved in commerce" is so vague and indefinite as to be impossible to determine whether a business operation comes within the Act; and further, that the Act violates defendants' "property right and right of liberty protected by the Fifth Amendment."

Defendant Bessinger further contends that the Act violates his freedom of religion under the First Amendment "since his religious beliefs compel him to oppose any integration of the races whatever."

The constitutionality of the public accommodations section, Title II of the Civil Rights Act of 1964, 42 U.S.C. Section 2000a, has been fully considered and determined by the United States Supreme Court in Heart of Atlanta Motel, Inc. v. United States, et al., 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); see also Willis v. Pickrick Restaurant, D.C., 231 F.Supp. 396 (1964), appeal dismissed, Maddox v. Willis, 382 U.S. 18, 86 S.Ct. 72, 15 L.Ed.2d 13 (1965).

■ The constitutional questions posed by defendants herein were before the Supreme Court in *McClung* and *Atlanta Motel*, supra, and were decided adversely to defendant's contentions. Consequently, defendant's defenses founded upon the due process and equal protection clauses of the Fourteenth Amendment, the Fifth Amendment, and the Commerce Clause of the Constitution are found by the court to be without merit in view of the *McClung* and *Atlanta Motel* cases, supra. It is noted that in *McClung, Atlanta Motel* and *Pickrick Restaurant* the motel and restaurants involved were admittedly places of public accommodation under the Act, there being no factual issue as to whether they came within the purview of same. Neither was any question raised that the restaurants involved therein were not principally engaged in selling food for consumption on the premises. The sole consideration before the lower courts and the Supreme Court in those

cases was the question of the constitutionality of the public accommodations provisions of the Act (Section 2000a).

 Neither is the court impressed by defendant Bessinger's contention that the judicial enforcement of the public accommodations provisions of the Civil Rights Act of 1964 upon which this suit is predicated violates the free exercise of his religious beliefs in contravention of the First Amendment to the Constitution. It is unquestioned that the First Amendment prohibits compulsion by law of any creed or the practice of any form of religion, but it also safeguards the free exercise of one's chosen religion. Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). The free exercise of one's beliefs, however, as distinguished from the absolute right to a belief, is subject to regulation when religious acts require accommodation to society. United States v. Ballard, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944) (Mails to defraud); Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878) (polygamy conviction); Prince v. Commonwealth of Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1943) (minor in company of ward distributing religious literature in violation of statute). Undoubtedly defendant Bessinger has a constitutional right to espouse the religious beliefs of his own choosing, however, he does not have the absolute right to exercise and practice such beliefs in utter disregard of the clear constitutional rights of other citizens. This court refuses to lend credence or support to his position that he has a constitutional right to refuse to serve members of the Negro race in his business establishments upon the ground that to do so would violate his sacred religious beliefs.

The sole question for determination under the circumstances of instant case is whether any or all of defendants' eating establishments are places of public accommodation within the meaning and purview of Section 201 of Title II of the Civil Rights Act of 1964 (Section 2000a).[2] In arriving at this determination the court is primarily concerned with the following factual and legal questions, which will be considered in inverse order hereinafter: (1) Is corporate defendant's establishments, or any of them, "principally engaged in selling food for consumption on the premises;" (2) Does said defendant at its establishments serve or offer "to serve interstate travelers;" and (3) has "a substantial portion of the food which it serves, * * * or other

2. "§ 2000a. *Prohibition against discrimination or segregation in places of public accommodation—Equal access*
"(a) All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.
"*Establishments affecting interstate commerce or supported in their activities by State action as places of public accommodation; lodgings; facilities principally engaged in selling food for consumption on the premises; gasoline stations; places of exhibition or entertainment; other covered establishments*
"(b) Each of the following establishments which serves the public is a place of public accommodation within the meaning of this subchapter if its operations affect commerce, or if discrimination or segregation by it is supported by State action:
"(1) * * *
"(2) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility, principally engaged in selling food for consumption on the premises, including, but not limited to, any such facility located on the premises of any retail establishment; or any gasoline station;
"(3) * * *; and
"(4) * * *
"(c) The operations of an establishment affect commerce within the meaning of this subchapter if (1) * * * (2) in the case of an establishment described in paragraph (2) of subsection (b) of this section, it serves or offers to serve interstate travelers or a substantial portion of the food which it serves, or gasoline or other products which it sells, has moved in commerce; * * *"

products which it sells * * * moved in commerce"?

Should the court's answer to question #1 be in the affirmative, and either questions #2 or #3 in the alternative in the affirmative, then such of defendants' establishments are places of public accommodation within the purview of the Act, and plaintiffs are entitled to the requested relief as to these establishments.

The cause was heard by the court on April 4th and 5th, 1966. Subsequently excellent briefs and arguments have been filed by counsel for the parties. After a careful consideration of the evidence and the law and pursuant to Rule 52(a) of Federal Rules of Civil Procedure the court makes its findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Defendant Piggie Park Enterprises, Inc., hereinafter designated as Piggie Park, is a South Carolina corporation with its principal office in Columbia, South Carolina. Defendant L. Maurice Bessinger, hereinafter designated as Bessinger, is the principal stockholder and general manager of the corporate defendant.

2. Piggie Park owns, operates, or franchises six eating establishments specializing in Southern style barbecue which are located as follows:[3] 1) Piggie Park No. 1, 1601 Charleston Highway, also being designated as U. S. Highways Nos. 21, 176 and 321 at the intersection of S. C. Highway No. 215, in West Columbia, South Carolina; 2) Piggie Park No. 2 on the Sumter Highway, also being designated as U. S. Highways Nos. 76 and 378 in Columbia, South Carolina; 3) Piggie Park No. 3 on the Camden Highway, also being designated as U. S. Highway No. 1, in Columbia, S. C.; 4) Piggie Park No. 4 on Broad Street Extension, which is also designated as U. S. Highways Nos. 76, 378 and 521 in Sumter, South Carolina; 5) Piggie Park No. 6

on Highway No. 291 By-Pass North, which connects U. S. Highways Nos. 25, 29, and Interstate Highways Nos. 85 and 385 in Greenville, South Carolina; and 6) Piggie Park No. 7, also known as "Little Joe's Sandwich Shop," at 1430 Main Street in Columbia, South Carolina. All of Piggie Park's eating places are of the drive-in type with the exception of Piggie Park No. 7 also known as "Little Joe's Sandwich Shop" in downtown Columbia. In order to be served at one of the drive-ins a customer drives upon the premises in his automobile and places his order through an intercom located on the teletray immediately adjacent to and left of his parked position. After pushing a button located on the teletray his order is taken by an employee inside the building who is generally out of sight of the customer. When the order is prepared a curb girl then delivers the food or beverage to the customer's car and collects for same. This is generally the only contact which any of defendant's employees has with any customer unless additional service is desired. The orders are served in disposable paper plates and cups, and may be consumed by the customer in his automobile on the premises or after he drives away, solely at his option. There are no tables and chairs, or counters, bars or stools at any of the drive-ins sufficient to accommodate any appreciable number of patrons. The service is geared to service in the customers' cars. Piggie Park claims the distinction of operating the first drive-in specializing in barbecue although it sells other types of short orders. The barbecue meat and hash comprising a substantial majority of its sales are sold in bulk by the pound or the quart, as well as in individual orders. Customers are encouraged to consume the food off the premises by its service in disposable containers, with no chinaware or silver eating utensils being used. At the five drive-ins the carry-out business for off-the-premises consumption

3. The official South Carolina State Highway Department Primary System Map for 1965–66 has been used in determining the United States and State Highway designations.

averages fifty percent during the year, depending upon the season and the weather.[4]

3. Piggie Park No. 7, or "Little Joe's Sandwich Shop", in downtown Columbia is the one exception to the drive-in type operation. Defendant operates this establishment as a cafeteria type sandwich shop offering three-minute service, also specializing in barbecue, with table and chair seating capacity for sixty customers and where the food is primarily consumed on the premises. It is located in the prime shopping area of Columbia's Main Street; ninety percent of its business is between 11:00 a.m. and 2:30 p.m., with the majority of its customers being office workers, clerks and downtown shoppers. Its business hours correspond generally with those of the surrounding retail stores.

4. Two of the Negro plaintiffs were denied service by Piggie Park No. 2 on the Sumter Highway in Columbia on August 12, 1964 when they drove upon the premises in their automobile. At first a waitress who came out seeing that they were colored went back into the building without taking their order or saying anything to them. Shortly a man with an order pad came to their car, he also refused to take their order, and gave no reason or excuse for this denial of service, although other white customers were being served there at that time. The fact that Piggie Park at all six of its eating places denies full and equal service to Negroes because of their race is uncontested and completely established by the evidence. The limited Negro customers who are served must place and pick up their orders at the kitchen windows and are not permitted to consume their purchases on the premises. Thus, Negroes because of race are being denied full service and are victims of discrimination at all of Piggie Park's eating establishments.

5. No effort is made by defendant to determine whether a Negro customer who purchases food on a take-out basis is an interstate traveler.

6. Piggie Park displays on each of its establishments one modest sign located generally in the front window advising that it does not serve interstate travelers. In its newspaper advertisements is included a notice in small print at the bottom of the ad advising that "we do not serve interstate travelers".[5] No mention of this practice is included in any of its radio advertisements for business. Although some testimony and business records indicate that defendant has refused to serve a very limited number of interstate travelers in the past, the inescapable conclusion demanded by all of the circumstances before the court is that many interstate travelers do obtain service at all of its locations. Except for the small sign in the window no steps are taken by defendant at "Little Joe's

4. The uncontradicted testimony of defendant Bessinger at pp. 222–223 of Tr. was as follows:

"Q Mr. Bessinger, with reference to the total volume of your business, do you know how much of your business is carry out, or take away business from your drive-ins?

"A Yes. Of course, as I said, we try to encourage this to the maximum degree. This would average 50%. Carry out would average 50%. I say average, because in the real cold temperature it would jump up to eighty to ninety percent; in the real hot temperature it would also jump up to eighty to ninety percent. So it will have an overall percentage of my business that I know for a fact is carried back to the office or carried back home or carried on a picnic, what have you.

"Q Do you in fact have facilities for bulk carrying out?

"A Yes we sell a lot of barbecue by the pound. We sell a lot of quarts of hash by the quart, and slaw by the quarts, and rice by the quarts. We built up quite a big business on that.

"Q Carry off?

"A Oh absolutely, and July 4th we sell several tons of barbecue."

It is noted that plaintiff's counsel did not cross-examine Bessinger to any extent in reference to the above testimony and no evidence was offered to counter or rebut the same.

5. See defendant's Exhibit "G".

Sandwich Shop" to determine whether or not a customer is an interstate traveler, and at its drive-ins no attempt to determine a customer's travel status is claimed to be made until after his order is prepared and actually delivered to his automobile. If the curb girl who serves the order notices that a customer's car bears an out-of-state license, she is instructed to inquire whether such customer is an interstate traveler or is residing in South Carolina. There is testimony to the effect that if the customer admits that he is an interstate tourist service is denied to him although the food has been especially prepared to his order. No inquiry whatever is ever made of any customers who are riding in an automobile with South Carolina license plates. Inasmuch as all five of defendant's drive-ins are located at most strategic positions upon main and much traveled interstate highways and especially in view of the limited action taken by defendant to determine the travel status of its customers the court can only conclude that defendant does serve interstate travelers at all of its locations.[6]

7. Several employees of wholesale food companies which regularly sell foodstuffs and other merchandise to Piggie Park testified that the bulk of the food and related products sold by their firms to defendant was and is obtained by them from producers and suppliers beyond the State of South Carolina as follows:

(a) Greenwood Packing Company, a large supplier of meat products, purchases two-thirds of its merchandise from suppliers outside of South Carolina. They sell primarily pork shoulders, spareribs and Boston Butt (a cut off the shoulder). All hogs are live when purchased by it. They are there-after slaughtered, cut-up, processed and packed within the State of South Carolina. Its total sales to defendant during the fiscal year 1964–65 was $39,663.91 and $15,148.24 from June 1 through December 12, 1965. Its sales to defendant are made without keeping records to indicate which of its meat is produced or slaughtered in South Carolina as contrasted to that which is purchased by it from out-of-state already processed and ready for sale to defendant.

(b) Dreher Packing Company of Columbia, South Carolina, a wholesale distributor of luncheon meats, pork sausage, beef and ground beef patties regularly sells meat products to defendant. Approximately eighty percent of the meat products sold by it to Piggie Park is acquired from suppliers from outside of South Carolina, and no records are maintained to distinguish the in-state from the out-of-state items. However, all of its meat products is processed in some manner by it within the state before sale and delivery to defendant. It considers defendant as one of its good customers.

(c) Holly Farms Poultry Industry, which secures eighty-five percent to ninety percent of its chickens from a North Carolina supplier, sells a small quantity of meat each month to defendant.

(d) Piggie Park no longer sells beer at any of its locations, its licenses having expired in June 1965. Prior to that time substantial quantities of beer were purchased from Schafer Distributing Company of Columbia, none of which was brewed in South Carolina. It also purchased beer from Acme Distributing Company, distributors of Pabst Blue Ribbon beer which was

6. The only direct evidence adduced by plaintiffs tending to establish service to interstate travelers was the testimony of their witness, Sharon A. Miles, a white woman who entered "Little Joe's Sandwich Shop" on April 2, 1966 and obtained service without any question. Upon cross-examination she admitted that she and her husband who is the Columbia Director for the South Carolina Board of Voter Education Project had resided in this state for one and one-half years. Apparently plaintiffs made no attempt to conduct any surveys at defendant's drive-in establishments to show that customers in out-of-state automobiles were actually being served at any of defendant's locations.

shipped into the state from Peoria, Illinois.

(e) Defendant purchases pepsi-cola syrup by the gallon from Pepsi-Cola Bottling Company of Columbia. The ingredients which go into this syrup are shipped into South Carolina from New York, Kentucky and Georgia. During 1965 defendant purchased 1,-374 gallons of the syrup at $2.75 per gallon, including tax.

(f) Defendant regularly buys fresh, frozen and canned foods from Pearce-Young-Angel of Columbia, a large wholesaler. With the exception of its eggs all items regularly sold to defendant, including limes, onions, beef patties, cabbage, lettuce, tomatoes, french fried potatoes, bell peppers, shrimp and cheese are produced out of South Carolina. Defendant's purchases from this firm during the fiscal year 1964–65 amounted to $41,255.45, most of which had moved into the state in commerce.

(g) Thomas and Howard Company of Columbia, a large wholesale distributor of food and related products, regularly sells merchandise to defendant such as coca-cola syrup, sugar and salt. Altogether it handles approximately 7,000 items with about sixty percent or more being food items, mostly produced or manufactured in states other than South Carolina. Thus a large quantity and variety of the products purchased by defendant from this company have moved in commerce. Although only about sixty percent of the items purchased from it are foodstuffs the remaining forty percent of the items as herein enumerated are necessary and related to either the preparation of defendant's food for sale or its service of same.

(h) Epes-Fitzgerald Company sells to defendant paper products consisting of cups, plates, napkins, waxed paper, paper bags and boxes. Of these items all are manufactured outside of South Carolina except the paper cups and the paper boxes.

(i) Trusdale Wholesale Meat Company of Columbia sold a substantial quantity of meat products to defendant up until August 1965. Since that time they have made no sales to the defendant. This supplier received less than five percent of its products from outside of South Carolina.

(j) Roddey Packing Company of Columbia also supplies meat products to defendant. Approximately twenty percent of its hogs are purchased live out-of-state and then slaughtered and processed in South Carolina before sale to its customers.

(k) Southeastern Poultry Company of Columbia is another supplier of chickens to defendant. All of its chickens are grown and processed in South Carolina. During 1964 its sales to defendant totalled $6,895.82 and in 1965 totalled $13,757.48.

8. Mrs. Merle Brigman, defendant's bookkeeper and chief buyer of its merchandise, testified that she had made a compilation from defendant's records which she keeps to determine what percentage of food served by defendant was either produced, grown or processed in South Carolina. In arriving at her percentages she did not include as out-of-state foods such items as live hogs and cows purchased out-of-state by their suppliers when slaughtering or any processing were done in the state prior to delivery to defendant. Neither did she include pepsi-cola syrup concentrate purchased from the Pepsi-Cola Bottling Company as an out-of-state product since it was mixed and processed within the state. Not included in her percentages were any of the ancillary or related items purchased by defendant's suppliers from out-of-state such as salt, sugar, paper products, spices, etc. She concluded that twenty-five percent of the "food" purchased by defendant during fiscal years 1963–64 and 1964–65 was "processed and/or manufactured" outside of South Carolina, and seventy-five percent was produced and/or manufactured into "food" within South Carolina.

She further testified that eighteen percent of defendant's "food" purchased during the period of June 1, 1965 through December 12, 1965 was "processed and/or manufactured" into "food" out-of-state.[7] Defendant's bookkeeper also testified that defendant's expenditures for food and related items for fiscal year 1963–64 totaled $240,565.58 and for fiscal year 1964-65 totaled $222,845.25. Its expenditures for May 31, 1965 through December 12, 1965 were $122,724.13.

Considering defendant's admission that from eighteen percent to twenty-five percent of its "food" in a finished and ready-for-use form for the years 1963 through 1965 moved in commerce into the state from another state; also the large quantities of live cattle, hogs and chickens purchased by defendant's suppliers from outside of the State and slaughtered and processed within the State before delivery to defendant, which were not included by defendant in its out-of-state percentages, along with other foodstuffs purchased by it which were shipped into the State and processed herein, together with such related items as sugar, salt, pepper, spices and sauces which admittedly moved in commerce, it is obvious that considerably more than twenty-five percent of the total food products served by defendant came from outside of the State. The court is persuaded and therefore finds that at least forty percent of the food served by defendant during the years in question "moved in commerce".

## CONCLUSIONS OF LAW

■ By Section 2000a(c) Congress has determined that an establishment described in paragraph (2) of Subsection (b) of Section 2000a affects commerce within the meaning of the public accommodations subchapter of the Act if "it serves or offers to serve interstate travelers or a substantial portion of the food which it serves * * *, has moved in commerce". As was stated by the Three-Judge Court in Willis v. Pickrick Restaurant, 231 F.Supp. 396 at page 399 (N.D. Ga. 1964):

"[T]he application of the Civil Rights Act to these defendants depends upon the resolution of issues of fact, for a restaurant is not brought within the definition of interstate commerce unless it meets one of the tests enumerated in subparagraph (c) of Section 201. *These tests are in the alternative.* Either it must serve or offer to serve interstate travelers, *or* a substantial portion of the food which it serves or other products which it sells must have moved in interstate commerce." (Emphasis added.)

Moreover, the Supreme Court in *McClung,* supra, in upholding the constitutionality of the public accommodations section of the Act indicated that Congress has made sufficient findings of discrimination to be conclusive and acted within its constitutional right granted by the Commerce Clause of the United States Constitution. Thus it is not necessary in this or any other individual case to determine that defendant's acts in actuality affect commerce in and of itself; but it is necessary to determine whether defendant in the operation of its eating establishments serves a substantial portion of food which has moved in interstate commerce, *or* whether it serves or offers to serve interstate travelers. If it is determined that defendant's establishments meet either of these tests in the alternative, then under the Act they affect commerce.

■ Has a substantial portion of the food which defendant serves in its six eating establishments moved in interstate commerce? In line with the factual determinations hereinabove arrived at the answer is yes. Although the Act does not specifically define "substantial" the court construes it in the light of its usual and customary meaning: That is, something of real worth and importance; of considerable value; valuable; something worthwhile as distinguished

---

7. See defendant's Exhibit "E", witness's compilation of in-state and out-of-state foods.

from something without value or merely nominal.[8]

▆ Under defendant's own admission that twenty-five percent of the foods it served in the years 1963–64 and 1964–65 and eighteen percent for the first six months of fiscal year 1965–66 moved in commerce, the court has no hesitancy in concluding as a matter of fact and law that a "substantial" portion of the food which it serves has moved in interstate commerce.

Neither can the court agree with defendant's contention that all foodstuffs, including hogs, beef and chickens, together with other related items, which are slaughtered or processed within the State after having been shipped in from another state, should be considered as instate goods which have not moved in commerce on the basis that they came to rest in this state and thereby became intrastate in character. Such contention was overruled by *McClung*, supra, 379 U.S. at page 302, 85 S.Ct. at page 383 where the Court stated:

"Nor are the cases holding that interstate commerce ends when goods come to rest in the State of destination apposite here. That line of cases has been applied with reference to state taxation or regulation but not in the field of federal regulation."

▆▆ From the foregoing this court has a mandate from the Supreme Court to conclude that all products sold to defendant as food by its producers which have moved in interstate commerce into this state in some form, even though they may have been slaughtered or otherwise processed after arrival here, are to be considered as food which has moved in commerce, as that phrase is used in Section 2000a(c) (2) of the Act. Therefore, by including all foodstuffs served by the defendant during the periods under consideration which have moved in interstate commerce the court has concluded that at least forty percent of the same has moved in commerce and unques-

tionably constitutes a "substantial" portion of the total food which it serves in all of its six locations.

▆ Does the defendant serve or offer to serve interstate travelers? As hereinabove pointed out, the direct evidence produced by plaintiffs that defendant serves or offers to serve interstate travelers is slight, unimpressive and inconclusive; however, from all the circumstances before the court there is no doubt but that defendant has served and is serving interstate travelers. This is apparent from the testimony of a witness who testified that upon presenting herself for service at "Little Joe's Sandwich Shop" no inquiry whatever was made as to her place of residence. Probably of more import is the fact that all five of defendant's drive-ins are located upon much traveled interstate and federal highways with large signs at and about each location advertising its products. Defendant also advertises for business in daily newspapers and over the radio. Moreover, it *employs no reasonably effective means of determining whether its customers are inter- or intra-state travelers.* The court, therefore, concludes that defendant serves or offers to serve interstate travelers at all of its locations.

Having concluded that all of defendant's establishments "affect commerce" within the provisions of Section 2000a(c) (2) of the Act, the third and last question for determination arises from the construction to be given to subsection (b) (2) of said section of the Act which provides that "any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility *principally engaged in selling food for consumption on the premises*" [emphasis added] is a place of public accommodation within the meaning of the Act.

▆ Do defendants' drive-ins and sandwich shop come within the ambit of the Act as intended by Congress? The court has no difficulty in deciding that "Little Joe's Sandwich Shop" is within

---

8. Definition of "substantial" contained in Black's Law Dictionary, Fourth Edition, 1951.

the coverage of the Act. It comes within the usual and customary definition of a restaurant, lunchroom, lunch counter, or other eating establishment mainly engaged in serving food for on-the-premises consumption. It caters to walk-in customers who are furnished tables and chairs, including a balcony, where they may, and generally do, sit down and consume their orders within the building. Its facilities, operation, and clientele are entirely different to those of the five drive-ins, which have no such accommodations for diners to walk into buildings to be served and to eat inside. They cater entirely to motorized customers who do not alight from their automobiles to order or eat, whose orders are served in disposable containers, and fifty percent of all foods served to them is consumed off the premises.

By limiting the scope of places of public accommodation to restaurants, cafeterias, lunchrooms, soda fountains, and other facilities principally engaged in serving food for consumption on the premises, it is only reasonable to assume that Congress did not intend to include within coverage of the Act such eating places as defendant's drive-ins, which do not in the main provide its patrons with facilities to be seated so that their orders may be and generally are eaten on the premises. None of the reported cases dealing with eating houses has considered this aspect of the Act. Both *McClung* and *Pickrick Restaurant,* supra, involved conventional type restaurants which served their customers while seated at tables and who consumed the food entirely on the premises. Surely if Congress had intended to include within the public accommodations provisions of the Act all public eating establishments which it determined "affect commerce" if they meet either of the alternate tests of Section 2000a(c) (2), then its including in Subsection (b) (2) of said Section the phrase "or other facility principally engaged in selling food for consumption on the premises" would be totally futile and meaningless. Our review of the Act's legislative history, committee reports, and congressional debates has failed to indicate a contrary motivation. The court must assume from its verbiage that Congress intended to limit the coverage of the Act to those eating places primarily engaged in serving food for on-the-premises consumption.[9]

Indeed this court has no motive, intent or purpose to extend by judicial fiat any of the provisions of the Civil Rights Act of 1964 beyond the scope clearly enunciated and adopted by Congress.

Although it has been stated that the term restaurant has no definite legal meaning unless defined by statute, Congress was well aware that an eating place or a restaurant in the generally accepted sense is defined as follows: "A public place where food is sold casual guests to be eaten upon the premises; a house where cooked provisions are sold, to be eaten on the premises; a house where food is sold to customers; a place of re-

---

9. Whether "principally engaged in the sale of food for consumption on the premises" qualifies "any restaurant, cafeteria, lunchroom, lunch counter, soda fountain" or only "other facility" has opposing persuasions. The House Report of the Committee on the Judiciary, 2 U.S. Cong. & Admin.News 1964, pp. 2391, 2395 reads as follows:
"*Section 201(b)* defines certain establishments to be places of public accommodation if their operations affect commerce * * * These establishments are * * * (2) restaurants, lunch counters, *and similar establishments,* including those located in a retail store; and gasoline stations." (Emphasis add-

ed.) By this statement the inference could be drawn that the disjunctive "or" in Section 201(b), as enacted, limited the qualifying phrase to "other facility". In other words, "or other facility principally engaged in selling food for consumption on the premises" means only "and similar establishments". The court, however, is persuaded in that "other" as used in its primary sense of "one of two or more" requires the qualifying phrase to be read with "any restaurant, cafeteria, lunchroom, lunch counter, soda fountain" or at least required to be used to define "restaurant, lunchroom, lunch counter, soda fountain."

sort for meals". 28 C.J.S. pp. 825–826. In State v. Shoaf, 179 N.C. 744, 102 S.E. 705, 9 A.L.R. 426 (1920), the Supreme Court of North Carolina in applying a Sunday law stated:

"The terms 'restaurant' and 'cafe,' in common parlance \* \* \* are substantially synonymous. A restaurant is generally understood to be a place where refreshments, food, and drink are served \* \* \* While the word 'restaurant' has no strictly defined meaning, it seems to be used indiscriminately as a name for all places where refreshments can be had, from a mere eating house and cookshop to any other place where *eatables are furnished to be consumed on the premises*." (Emphasis added.) See also the annotation in 122 A.L.R. page 1399.

Even if defendant's drive-ins were found to be restaurants or eating places within the popular and usual definition, they should not be considered as facilities "principally engaged in selling food for consumption on the premises". The adverb "principally" is defined as "primarily; chiefly, mainly, in the principal manner, in the chief place or degree". Webster's International Dictionary, Second Edition. Under the plain meaning of the phrase one who serves fifty percent or less of its food which is taken away and eaten off the premises cannot be held to be *principally* engaged in selling food for consumption on the premises. The uncontradicted evidence before the court is that only fifty percent of the food served at defendant's drive-ins is consumed off the premises, and all of its patrons are encouraged to take their orders elsewhere for consumption.

The court therefore concludes that defendant's five drive-in establishments are not principally engaged in serving food for on the premises consumption,

and are not places of public accommodation within the meaning and purview of the Civil Rights Act of 1964; thus, plaintiffs are not entitled to the demanded relief as to them. On the other hand it is concluded that "Little Joe's Sandwich Shop" is principally engaged in selling food for consumption on the premises, and is therefore a place of public accommodation with the Act. As to it, plaintiffs have established their right to the requested relief. It is, therefore,

Ordered that an injunction will issue in the following terms:

(a) The defendants, Piggie Park Enterprises, Inc., and L. Maurice Bessinger, their agents, employees, successors, and all persons acting in concert with them, and at their direction, are enjoined from refusing to admit Negroes to the premises of Piggie Park No. 7, also known as "Little Joe's Sandwich Shop", located at 1430 Main Street, Columbia, South Carolina, upon the same basis and upon the same conditions that non-Negro members of the general public are admitted to said establishment;

(b) They are also enjoined from failing or refusing to sell food, meals, or other merchandise and to provide services, facilities, privileges, advantages and accommodations to Negro patrons at said establishment upon the same basis and upon the same conditions that they are made available to patrons and customers of other races.

In order that the defendants may have an opportunity to appeal, and if they so desire to seek a stay of this order until such appeal is consummated, it is ordered that the foregoing injunction shall become effective thirty days from the date hereof, to wit, on the 27th day of August, 1966. Court costs exclusive of attorneys' fees are hereby awarded to plaintiffs. Let judgment be entered accordingly.