Carl H. NEWBERN, Bertha S. Newbern, Plaintiffs,

v.

LAKE LORELEI, INC., an Ohio corporation for Profit, Fayetteville, Ohio, Lake Lorelei Property Owners Association, an Ohio Corporation Not for Profit, Fayetteville, Ohio, Defendants.

Civ. A. No. 6871.

United States District Coourt S. D. Ohio, W. D.

Nov. 14, 1968.

Norris Muldrow, Peter J. Randolph, Cincinnati, Ohio, for plaintiffs.

Ambrose H. Lindhorst, James L. O'Connell, Lindhorst & Dreidame, John A. Lloyd, Jr., Cincinnati, Ohio, for defendants.

## MEMORANDUM AND ORDER, INCLUDING PRELIMINARY INJUNCTION

HOGAN, District Judge.

### STATUS

This case was filed on September 30, 1968, under 42 U.S.C. § 1981 et seq. These sections were originally passed in 1866 and were part of the original Civil Rights Acts. § 1981 provides:

"All persons * * * shall have the same right * * * to make and enforce contracts * * * and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, *pains*, * * * and exactions of every kind, and to no other."

§ 1982 provides:

"All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, *purchase*, lease, sell, hold, and convey real and personal property."

§ 1983 provides:

"Every person who, under color of * * * custom, or usage, * * * subjects, or causes to be subjected, any citizen of the United States * * * to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

The plaintiffs' complaint basically sets forth two causes of action. The first cause of action is asserted by the plaintiff and his wife as individuals in that they claim that they were deprived of the right to buy a lot at Lake Lorelei under circumstances violating the Civil Rights Act of 1866 and "specific performance" of the exercise of that right is prayed for. Essentially, the second claim is this: the plaintiffs claim that they, as Negroes, represent and therefore bring a class action against the defendants to enjoin the defendants' continuance in and claimed anti-civil rights activity. The complaint prays for injunctions, restraining and mandatory, and in addition, for similar injunctions of a temporary nature, as well as an "all writs" injunction. The plaintiffs sought a restraining order which was assigned for hearing, on notice, on October 14. All of the parties desired additional discovery and an initial hearing in a preliminary injunction status rather than a restraining order. Some informal oral status quo agreements having been reached, the matter was passed until November 4, at which time it was heard on the motion for the preliminary injunc-

tion. The evidentiary hearing terminated on November 8.

On October 21, the defendants filed a motion under F.R.Civ.P. 23, seeking the dismissal of the case as a class action, or in the alternative, a determination of the type and the delimiting and definition required by Rule 23. On October 21 the defendants also filed a motion for a summary judgment, claiming a "rescission or abandonment" by the plaintiffs. On October 28 the defendants filed another motion to strike and also to make definite and certain, and finally on October 30, one defendant filed an additional or supplemental motion to strike. All of these motions will be disposed of herein.

The defendants' time to answer had not expired by the time the evidentiary hearing was concluded.

## THE FACTS

In 1966 a development company based in Memphis, Tennessee, "American Realty Service Corporation," determined to develop from scratch a relatively condominium resort, second-home and retirement community in Brown County in this District. Some 1700 acres of land were purchased by an Ohio corporation (organized by the developer) "Lake Lorelei, Inc."—one of the defendants in this case and the actual developer. The development was to and eventually has included a man-made lake covering some 200 acres several miles from the Village of Fayetteville. This, of course, included the installation of a dam. Some 1200 plus lots resulted. (In this instance, as well as others in this memorandum, there will be no attempt at any minute exactness.) For instance, whether there are 1200 or 1400 is unimportant—the important thing is that the development contemplates the transition from a corn field to a real estate venture inhabited by (taking the normal ratio of four persons to one family) more than 5,000 people—which would qualify it for the status of a city under Ohio law, as distinguished from the status of a village.

(Ohio Revised Code § 703.01) The development also includes miles of roads, a large Bavarian type club house offering over 5,000 square feet of usable floor space, a 750 foot sandy beach, boat docks, a marina (the contemplated resort type activities, including fishing, swimming, water skiing, boating, shuffle board, volley ball, badminton, etc.). In addition, there are a number of areas designed for picnic and other outdoor recreational uses. All of the contemplated improvements have been accomplished to date. Shortly after the defendant Lake Lorelei, Inc. was incorporated, another Ohio corporation, not for profit, was organized in April, 1967. It is a defendant in this case and its name is the Lake Lorelei Property Owners Association, Inc.

The ultimate purpose of Lake Lorelei, Inc. is this: Lorelei, Inc. intended to and has in fact, maintained full and complete control over the disposition of the lots and over the communal areas until the last lot is sold. It is crystal clear that the estimated date—as of 1967—was on or about February 1, 1970. Up to that time, the title to the streets and all the other communal areas remains in Lorelei, Inc. A water company of a commercial type has also been organized by Lorelei, Inc., which is supplying water from wells. It is not clear from this record what is going to happen to the water company. In any event, if, as and when the last lot is sold, Lorelei, Inc. will transfer all of the communal areas to the Association (i. e., Lake Lorelei Property Owners Association, Inc., which we will hereinafter refer to simply as "Association;" Lorelei, Inc. will be referred to hereinafter simply as "Inc.") As a person buys property, he automatically becomes a member of the Association. He also pays the Association $48.00 a year in dues to enable the Association to perform its functions. When the last lot is sold, Inc. will withdraw from the scene and the responsibilities of operating the "plant" will pass to the Association. In the

meantime, however, it is quite clear that the Association is merely the alter ego of Lorelei, Inc.

The Association was incorporated by the established counsel for Inc. The three trustees originally appointed and still acting as such for the Association are a Mr. Lauer, and a Mr. Allen, who are the managing officers—"on the spot"—of Inc. The third is a Mr. Boone, who lives in Columbus, Ohio, and who is not otherwise identified in this record. The three trustees, in April of 1967, elected Boone as President, Allen as Secretary-Treasurer, Lauer as Vice President. Those self same individuals were constituted by the trustees, also in April, 1967, as the "Executive Committee" of the Association. The Executive Committee of the Association, so chosen, has the "specific function of reviewing applications submitted by prospective members, for accepting and electing members, termination of membership, the issuance of guest cards, etc., and to keep the Board and Treasurer informed as to the distribution of membership, including names of delinquent members, with any recommendations which said Committee deems appropriate." It is authorized to promulgate rules with respect to the use and occupation of communal premises by the members, to adopt rules and regulations affecting the use of the lake in conjunction with the Brown County Zoning Commission, to hire a caretaker, to take steps necessary to comply with any order of the county or state boards of health. In a nutshell, the Executive Committee, when the overall control has passed, will be doing that type of work which a city council generally does. Until such time, its only real activity is that listed as its first activity, which is the function of deciding who may and who may not be members; or stated another way, who may or who may not purchase lots in Lake Lorelei. It is extremely significant that neither this Executive Committee, nor its Executive Committee ( ? ) has to this day seen fit to adopt or publish even one sentence which might be described as an objective

standard to follow in making such a determination. In any event, this Executive Committee has seen fit to divorce itself—as a matter of paper work—from that function. In July of 1967, there was created a "Special Executive Committee" to perform the duties in respect of accepting or rejecting "members"—or "purchasers." There is no doubt that that is the sole function of the Special Executive Committee to the Executive Committee. Its three members were the first three property owners. It is noted that, whereas the procedure called for by the bylaws was for the President of the Association to name any subsidiary Committee, the trustees saw fit to disregard the procedure so provided for.

Lorelei commenced selling lots in the summer of 1967. Since that time approximately 1,000 have been sold. The Special Executive Committee has held meetings at which more than 1,000 proposed members or purchasers have been approved. This was done at eight different meetings. At one of them the approvals aggregated some 300. At another the approvals aggregated about 250. A significant number of approvals were made after the purchases of the lots involved had been closed and the deeds recorded; or stated otherwise, a significant number of the offers were accepted and closed without the approval of the Special Executive Committee. No lot has been sold to a Negro.

The Fifth Circuit has long ago pointed out that "In the problem of racial discrimination statistics often tell much, and Courts listen." Alabama v. United States, 304 F.2d 583 (1962), affirmed 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112. We take judicial notice of the presence in the Cincinnati and Dayton areas of a substantial number of Negroes.

At the hearing the evidence established that a number of lots (five or six) have been sold to Asiatics; however, this is not a case in which the plaintiff claims that the defendants have discriminated against "browns." The Civil Rights Act of 1866 may well redound to the benefit of browns—but the "color"

which the Congress had in mind in § 1981 et seq., was not brown—it was black.

Lake Lorelei, Inc., both in 1967 and 1968, has advertised extensively through the usual forms. In addition, the American Realty Service Corporation has appeared as the sponsor of promotional "cocktail and dinner parties." The advertising calls for people to send in their names on blanks provided in the advertising, whereupon they may or may not be invited to such dinners, or may or may not receive other instructions on how to carry forward their interest. On this record no Negro has ever been invited to such a dinner and at least at one dinner, which was testified about on this record, no Negro was present. Some interested parties are given special price protection reservations. On making a deposit—let's say, of $25.00—the interested party is extended guest privileges at Lake Lorelei for ten days and the assurance that his deposit will be returned if he does not want to carry it any further. No Negro has ever been given the "special price protection reservation" and/or the guest privileges.

If a prospect comes up to the Lake, the procedure is this: He is shown around by a salesman and then if he wants to buy a given lot he is ordinarily given an "Agreement Form" which iden‐tifies the lot, the downpayment, and when and how the balance is to be paid. In the case of a cash buyer—that is, one who will be paying cash from his own pocket, when his deal is closed,—he also signs at that time a detachable negotiable promissory note in which he promises to pay that balance on or before a date certain. This Agreement recites that—

"The Purchaser applies for membership in the Association and agrees to pay the dues. * * * In the event the Purchaser is not accepted and is refused membership in the Property Owners Association, with or without cause or explanation, this Agreement shall be void and the Purchaser agrees to hereby waive and release any and all present or future rights whatsoever, without recourse or liability against Lorelei, Inc., or the Association * * * upon a refund by the Seller to the Purchaser of all * * * money paid by the Purchaser. * * * In the event of prior sale of the above described property, this Agreement shall be null and void without further liability to the Seller, except for the refund. * * *"

While the Purchaser signs this Agreement, the Seller never does and has not signed any of the thousand plus of these "Agreements" that have been closed.

▪ As we pointed out in respect of a cash purchaser, he also delivers a negotiable note. It is the law of Ohio that, "No action shall be brought * * * upon a contract or sale of lands * * * unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized." [1] We emphasize this fact because the plaintiff Doctor Newbern and his wife never had a contract in any sense of the word, so we never reach the question of abandonment or rescission. The so-called contract is illusory, to say the least.

In each instance in which a written offer is made, the offeror at the same time fills out an application for membership in the Association. This recites, among other things, that "I/we further agree and understand that I/we may be refused membership in the Lake Lorelei Property Owners Association without cause or an explanation and agree to hereby waive and release any rights whatsoever that I/we have or may have in the future, without recourse * * * in the event I/we are not accepted as members" of the Property Owners Association.

1. O.R.C. §§ 1335.04, 1335.05.

After the ordinary prospective buyer leaves the premises, having signed his offer, it is processed. "Processed" includes getting a credit check in respect of a time buyer. No other affirmative investigation is made by either Inc. or the Association. After the application is processed by Inc. it is turned over to the Special Executive Committee with Inc.'s recommendation. Insofar as the real Executive Committee of the Association is concerned, this is simply turning over a piece of paper from one hand of a person to the other hand, since the managers of Inc. are also the controllers of that Executive Committee. That is also true with respect to the Special Executive Committee. There will be no meeting of the Property Owners as such until February, 1970, and until that time the voice of Lorelei is reminiscent of the legend. The legend is based on an echo coming from a rock and the rock in this case is the Association, which merely echoes Inc.'s decisions.

There have been approximately 60 rejections by Inc. and its echo. The stated oral ground of the rejections by the witnesses in this case are threefold. First, previous immorality; second, a person must be married or about to be married, except in an unusual case; or stated otherwise, we do not sell to single people; third, we do not sell to people who might be "troublemakers." We have carefully examined a typical number of the records applicable to the rejections. (P.X. 22) It can be said with reasonable certainty that the rejections are initially made by Inc., that they are merely echoed by the Association and that they are all obviously on credit or commercial grounds. Two examples: In September of 1967 a buyer, whose initials are F.E.W., offered to buy Lot 1101 for $10,160; he deposited with his offer a check for $800.00. The check promptly bounced for "insufficient funds." In November of 1967, two months later, he was rejected by the Property Owners Association. Secondly,

on May 8, 1967, a prospective buyer, whose initials are E.T., offered to buy Lot 112 for $3,895.00 and he deposited with his offer a check for $95.00. The check promptly bounced. Six months later the Special Executive Committee rejected him.

We find only one instance in this record in which a prospective buyer[2] who had kept his "contractual" commitment—i. e., kept the terms of his offer—was rejected by the Property Owners Association and that is the plaintiff. In other words, the plaintiff Newbern, a Negro, so far as this record shows is the only such person who ever made an offer, performed the terms of his offer, and was rejected.

In any event, after the offer is made, the prospective purchaser receives a welcome letter conditional upon membership approval. Upon approval he receives a notice, together with a rules and regulations pamphlet, and a membership card. A very substantial number of the transactions are closed, as we have noted, before the membership approval is obtained; in that connection, it is also noteworthy that a very substantial number of the purchase transactions are closed by mail—the purchaser merely mails in his further downpayment or his downpayment, and a deed is mailed to him. As a matter of fact, Inc. has a form letter for use for such purposes, instructing purchaser to whom to mail the deed, i. e., the Recorder of Brown County.

We come now to the specifics involving the plaintiff Doctor Newbern and his wife. They are Negroes and, in any sense of the word, citizens of substance (whether that be intellectual, monetary or otherwise). They made three visits to Lake Lorelei, at least on some of them accompanied by their three children, two of whom are students in the Cincinnati Country Day School. The Doctor is a dentist; his wife is an employee of the Cincinnati Board of Education. On the second visit, he and his

---

2. Having substantial means of credit.

wife signed an offer to purchase Lot 1166 for $5,495.00, $2,000.00 down, balance of $3,495.00 due on or before August 25, 1968. He also signed a cognovit negotiable note for $3,495.00 due on or before August 25, 1968, and we are not informed on this record whether this note has ever been returned to him. He also signed an application for membership in the Association. He was given a reminder card to remind him that the due date of his $3,495 obligation was August 25th. He received the conditional welcome letter. On August 25th, a Sunday, he went to Lake Lorelei—a distance of approximately 30 miles. His wife accompanied him. He had no appointment; nor had the seller informed him before August 25th of any reason in the world why he should not come up and close on that date. He was accompanied by a lawyer. Persons closing real estate deals in this area generally are accompanied by lawyers—the bar associations unanimously advocate it.

The Newberns were on the premises one hour and a half to two hours before they were finally advised that the seller could not close on that date since the Property Owners Association had not met. We decline to go into the pros and cons of that afternoon in detail. While the doctor's conduct was described as, "He did not yell, he did not use profanity, he was polite," he is at the same time described as being "irritable and belligerent, more belligerent, and most belligerent." From all this, the defense claims that the Newberns became that afternoon, in the subjective judgment of the officers of Lorelei, Inc., persons "likely to cause trouble" in the communal atmosphere. If the exercise of a civil right is to depend on the subjective standard of any individual, it is a newly found method of repeal of a Congressional Act. We realize that the developer of a communal development has some obligations of selectivity in respect of purchasers—those obligations are capable of transposition to objective standards which will withstand the mandates of the Act of 1866. We do not imply

agreement with the description of the plaintiff Newbern's conduct by the defense witnesses. We disagree. We find that the conduct of the defendant in neglecting to call during the week preceding August 25th and report the claimed inability to close, and the conduct of the defendant salesman in passing his customer without a moment to devote to the same "claimed" reason, and/or the enforced wait demanded by a seller who had $2,000.00 in cash and a $3,495.00 cognovit negotiable note—which was as good as could be—we find those actions designed to cause what is described as a "belligerency."

On August 25th the Doctor tendered payment of his note. The tender was not accepted. He went home. He was "rejected" at a meeting of the Special Executive Committee on September 5, along with some nine others. The other rejectees are all explicable on monetary grounds. On September 6, he was mailed a letter informing him of the rejection and there was delivered to him a $2,000.00 check representing a refund "of all legal tender." He cashed it. This was no abandonment or rescission —it could not be because he had nothing to abandon or rescind. It was merely a rejected offeror's return to its proper place of the money deposited and rejected. Even if the claim could be made that a contract existed, it is the settled law of Ohio that the acceptance of a proffered rescission is not a rescission or an abandonment if the acceptance be induced by the other party's violation of the common law (let alone a statute). Jones v. Booth, 38 Ohio St. 405 (1882).

Not only had Inc. closed many a transaction before any formal action—paperwise—by the Special Executive Committee; the reason given the plaintiff Newbern of inability to close because of no meeting during August was false. P.X. 12 demonstrates that a number of deals signed or offered after August 1 were closed in August prior to the next meeting of that Committee. So, the stated reason was no reason at all. It is, therefore, conclusorily found as a fact that

the defendants discriminated against the plaintiff Newbern on August 25 by failing to close the transaction on that date. If Newbern had been white, the transaction would have been closed on that date. It was not closed by reason of their color.

■ In addition, on this record, we find these further acts of discrimination or evidence of discrimination based on color:

1) In September of 1968 at a promotional dinner in Dayton, Ohio, the defendant Inc., through its duly authorized representative, confirmed that Lorelei was a segregated enterprise and that the Property Owners would see to it that no Negroes would either buy or enjoy guest privileges of an owner.

2) In September of 1968, on the premises, the duly authorized representative of Lorelei, Inc. stated to a white person that the Property Owners would not admit any Negroes to membership. The statement was made to a white person who "masqueraded" as a buyer for purposes of testing the situation and giving testimony. The defendants liken that to an informer in a criminal case. However, even in a criminal case—let alone in a civil case—the testimony of an informer is competent (although it should be considered with caution). Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270; and there is no entrapment if the informer merely furnishes "a favorable opportunity." Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462.

3) One Negro, Moye, answered an ad, disclosed his race and made an appointment with a salesman of the defendant. The appointment was not kept for the reason that he was a Negro.

4) Another Negro, a Doctor Hawkins, of Middletown, Ohio, inquired at the Boat Show of the price of lots. The inquiry was made at an exhibit manned by the defendant. He was told that the price range was from $10,000 to $20,000. In fact, the price range is from approximately $2,900 to $10,000. The representation was made for discriminatory reasons and because he was a Negro.

5) In brushing off the Negro Van Lowery, on the occasion when he sought to discuss a possible purchase with a salesman.

6) Robert Baynes, in an "on the spot" interview with a salesman in the late spring of 1968, attempted to put up a $300.00 deposit—which was the deposit indicated as appropriate—for Lot 682. He was handed an application for membership which he, along with a lady who accompanied him, signed. Baynes and the lady are Negroes. He was not tendered an "offer" to sign. The deposit offer was declined. He was told that he would be informed of the action on his application within 15 days. He was not. He inquired. He was put off. To this date his name has never been presented to the Special Committee. In September, Lot 682 was sold to Jerry Maxa, a white person. Baynes was never informed of that fact until this case was filed. While it is claimed that the basis of this action toward him was because of a policy not to sell to unmarried people, this record affirmatively shows, through defense witnesses, that (at a minimum) white single persons are handled at the *salesman level* by offer signing, deposit and membership application signing. There is testimony that some such involving whites have been stopped at the *Management level* of Lorelei, Inc. It is found as a fact that the failure to extend to him the opportunity to sign an offer and make a deposit, as well as the failure to inform him and the "putting off" action, were discriminatory by reason of his color.

7) This record demonstrates the following acts of discrimination:

(a) In requiring Doctor Newbern to come up to the site rather than to close his transaction by mail.

(b) The false statement to Newbern that no August deals were being closed in August.

**416**

CONCLUSIONS OF LAW

■ 1. In exercising the discretion to grant or withhold a preliminary injunction, the Court must consider the petitioner's prospects on the merits and weigh the interests of the parties and the public. Liberty Lobby, Inc. v. Pearson, 129 U.S.App.D.C. 74, 390 F.2d 489 (1968).

■ 2. A trial court abuses its discretion when it fails or refuses properly to apply the law to conceded or undisputed facts. United States v. Beaty, 288 F.2d 653 (1961, 6th).

■ 3. The granting or denial of a temporary injunction is within the sound judicial discretion of a trial court. Hornback v. Brotherhood of R.R. Signalmen, 346 F.2d 161 (6th, 1965); American Federation of Musicians v. Stein, 213 F.2d 679, 689 (6th), cert. den. 348 U.S. 873, 75 S.Ct. 108, 99 L.Ed. 687.

■ 4. The 13th Amendment, as well as the Civil Rights Act of 1866 (42 U.S.C. § 1981 et seq.) "nullifies sophisticated as well as simple-minded modes of discrimination." Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 (1939).

■ 5. 42 U.S.C. § 1982 prohibits *all* discrimination against Negroes in the sale of property, including discrimination in modes of negotiation. Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).

6. That is true even though the sale of the real estate involved automatically entitles the buyer and his family and guests to the use of communal real estate involved in a unified real estate development, such as a club house, swimming facilities, etc. Sullivan v. Little Hunting Park, Inc., 392 U.S. 657, 88 S. Ct. 2279, 20 L.Ed.2d 1346 (1968). See also 36 Law Week. 3398, 3481.

7. The type of property involved in this case is not reached by the Fair Housing Act of 1968 (P.L. 90—284, 82 Stat. 73) until January 1, 1969. The plaintiffs have no Title VIII remedy and the claim rests solely on § 1981, et seq.

(and the underlying XIII and XIV amendments). See § 803(a) (1) of Title VIII, The Fair Housing Act.

■ 8. 42 U.S.C. § 1981 et seq. transcends any state statute of frauds. A plaintiff aggrieved under § 1981 et seq., who has made a satisfactory monetary offer, may reach the specific property (with its emoluments, including membership in a Property Owners Association) involved in a § 1981 action. The Ohio Statute of Frauds (Ohio Revised Code §§ 1335.04 and 1335.05) is no defense to such an action and the plaintiff need not establish compliance with such a statute. Jones v. Alfred H. Mayer Co., *supra*.

■ 9. On a showing of discrimination toward himself, and on a further showing of discriminatory conduct toward other members of his race, solely by reason of race, a plaintiff may appropriately file and prosecute a class action on behalf of himself and other members of his race.

Brunson v. Board of Trustees, etc., 311 F.2d 107 (4th 1962);

Newman v. Piggie Park Enterprises, Inc., 377 F.2d 433 (4th, 1967), rev. on other grounds 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968); and see same case 256 F.Supp. 941 (1966, S.C.);

Mapp v. Board of Education, etc., 319 F.2d 571, at 576 (6th, 1963);

Vann v. Toledo Metropolitan Housing Authority, 113 F.Supp. 210 (N.D. Ohio, 1953);

Potts v. Flax, 313 F.2d 284 (5th, 1963);

Cypress v. Newport News General and Non-Sectarian Hospital Ass'n, 251 F.Supp. 667, at 673 (1966, E.D.Va); and 375 F.2d 648 (4th, 1967).

■ 10. The plaintiff's cause of action attempting to reach specific property affirmatively is not a class action. There are no other members of that class (i. e., who have specifically offered except possibly Baynes). In that aspect the class requirement, i. e., existence of

a number of persons aggrieved too numerous to join (see F.R.Civ.P. 23(a) (1)) is not met, even if Baynes be included.

11. Where a Negro offeror, such as Newbern, meets the objective requirements of a seller-developer of a large real estate project selling lots in the 3–10 thousand class in the South West Ohio Area and makes an offer for a lot within the objective terms of the seller, and shows further that a substantial number of lots have been sold and none of the buyers is a Negro, a prima facie inference of discrimination arises as a matter of law. Cypress v. Newport News General and Non-Sectarian Hospital Ass'n, *supra*. This inference has not been explained. We conclude, therefore, both as a matter of fact (see findings of fact) and law that Newbern was discriminated against.

12. Reference is made to the factual findings of discrimination under the "Statement of Facts" above. To the extent any of them be mixed conclusions of law and fact, this Court also so concludes as a matter of law.

13. Insofar as the actions of Newbern and Baynes seek specific property, the action is not a class action and may be prosecuted only for the individual benefit of each of them.

14. Insofar as the actions of the plaintiffs seek an injunction enjoining future discrimination and limiting the action of the Association and its Special Executive Committee, the action is an appropriate class action. The requisites of Paragraph (a) of 23 F.R.C.P. and the requisites of (b) (2) of that Rule are met. The class consists of members of the Negro race. "The primary function of 23–B–2 will probably be in the civil rights area and where a party is charged with unlawful discrimination against a class, usually one whose members are incapable of specific enumeration." Moore's Manual of Federal Practice § 14.07(2) and Moore's Federal Practice Vol. 3 Supplement, page 3401; Barron & Holtzoff (Wright Edition)

Federal Practice & Procedure § 562; and see cases cited above in Conclusion 9.

15. The plaintiff Newbern is not estopped—nor did he abandon or rescind any right to file a claim under § 1981 et seq.—by cashing the check for $2,000.00 returning his deposit. See reference under "Facts." It is Hornbook that estoppel implies some detriment to the other party—there is none here. The plaintiff Newbern, who received the check about September 8 and deposited it about September 15 and filed his complaint on September 30, acted with "deliberate" speed.

16. The plaintiff Baynes dealt for Lot 682. It has been sold to a Bona Fide Purchaser. A specific action toward that lot cannot be maintained. While a District Court has power in the circumstances to order a "cy pre" negotiation (see Jones v. Alfred H. Mayer Co., *supra*) this Court declines, as a matter of discretion, to so order. The reason is that Baynes, as a member of the class represented, may negotiate under the temporary order of this Court. As the Sixth Circuit said in United States v. Beaty, *supra*, 288 F.2d at 658:

"The injunction which we now direct provides adequate preliminary prohibition. Any landowner who, by persistence in a plan * * * or by refusal to deal * * * as commanded by the above injunction, * * * will have thereby exposed himself to punishment for contempt. We have no reason to think that such an injunction will be without efficacy to accomplish the end sought * * *."

Nor does this Court prejudge the validity of any reason given by the defendants for refusing to deal with Baynes— at the hearing some evidence of such was offered and excluded as not known to the defendants at the time Lot 682 was sold and therefore irrelevant to our present question. Whether it may become relevant remains to be seen.

17. Lorelei, Inc. and the Association are "joint ventures" in the sale

of lots; or stated otherwise, the Association is merely the "alter ego" of Inc. The Inc. *dictates* who to *accept* and who to *reject*. The only consistently applied objective standards involve ability to pay and the keeping of one's preliminary "contractual" commitments.

18. While the Property Owners Association may become a substantial independent entity in or about February, 1970, it is now in fact following the dictates of the Inc. in approving or disapproving members. Its only function and effect, insofar as membership approval and disapproval is concerned is to enforce Inc.'s policy of racial discrimination as the occasion may arise.

## ORDER (PRELIMINARY INJUNCTION)

1. The defendants' motion for summary judgment is overruled.

2. The defendant Inc.'s motion to strike insofar as it raises the punitive damages question is passed for determination to the hearing on the merits. Attention is invited to the $1,000.00 ceiling in the Fair Housing Act of 1968 which, in any event, would seem to dictate the ceiling. That motion is similarly passed insofar as it deals with damage questions. Otherwise the motion to strike is overruled for the reasons set forth by Judge O'Sullivan in Mapp v. Board of Education, etc., *supra*, 319 F. 2d at 576:

> "Partly because of the practical difficulty of deciding cases without a factual record it is well established that the action of striking a pleading should be sparingly used."

3. The action of the plaintiffs, insofar as it seeks a general anti-discrimination injunction, is determined to be a proper F.R.C.P. 23(B) (2) class action and it is so ordered, the class being members of the Negro race.

4. The motion to make definite and certain of the defendant Inc. is overruled.

5. The motion to dismiss as a class action is denied.

6. The motion of defendant Association to strike is overruled.

7. The defendant, Lorelei, Inc., is enjoined, during the pendency of this action, from selling, leasing, or in any way disposing, in whole or part, of Lot 1166, excepting only that it may sell same to the plaintiffs Newbern, or either of them, on terms not less favorable than contained in the August 4, 1968, offer (in which event, the defendants are ordered to issue to them the appropriate number of membership cards and decals and spread their names on the records of the defendants as approved owners and members of the Association).

8. Until such time as the defendants, Lorelei, Inc. and Lorelei Property Owners Association, have adopted and published objective standards for the determination of admission to membership in the Association and same have been approved by this Court (on motion regularly filed and noticed) the defendants are directed to delete from their proposed Contract (Offer) form the entire paragraph dealing with Membership (a paragraph dealing only with the dues may be used instead). Until such time the defendants will cease entirely the use of any form (e. g., Application for Membership, brochure, form letters) or any advertising which refers to "membership in the Association" as being a condition of purchase and sale. Until such standards be so adopted and approved, the authority of the Association, Inc., its Trustees, Executive Committee, and Special Executive Committee to determine membership is suspended and will not be exercised. On the contrary, it is ordered that the defendants, Inc. and Association, promptly enroll as members in the Association any persons who close the purchase of any of the remaining approximately 200 lots and issue the appropriate number of cards and decals.

9. The defendant, Lorelei, Inc., is ordered, pending the determination of this

case, to cease and desist all forms of discrimination by reason of color in the sale and disposition of lots; further, to deal in the same fashion with all persons interested in buying or negotiating for the purchase of said lots (without any discrimination by reason of color). The defendants are *not* ordered to sell any lots—if it is chosen so to do, the defendants, Lake Lorelei, Inc. and Lake Lorelei Property Owners Association, are directed to deal alike and without discrimination in any respect between white people, black people, brown people, or other colors or shades.

10. A summary, or copy, of Paragraphs 8 and 9 of this Order will be furnished by the defendant, Inc. to each of its sales personnel, its advertising agencies, and to the members of the Special Executive Committee.

11. The prayer of the plaintiffs for a preliminary injunction restraining the defendants from selling any and all lots owned by Lake Lorelei, Inc. is denied except insofar as Lot 1166 is concerned, as above set forth. It is adjudged that the result of this Order (11) is that the pendency of this action is not a lis pendens (under either Federal or Ohio law —see, for example, Ohio R.C. 2703.26) except in respect of Lot 1166.

12. The preliminary injunction orders issued herein are conditioned upon and become effective on the plaintiffs Newbern giving bond in the sum of $500.00 for the payment of such costs or damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. The Clerk is authorized to approve such Bond.

13. Leave is granted to any Negro who claims to have heretofore signed and delivered to Lorelei, Inc. either an Offer to Purchase or an Application for Membership to intervene in this cause and file an Intervenor's Complaint within 30 days.

14. So ordered as above.